UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------- x
CALVIN BATTLES,

        Petitioner,

   -against-

THOMAS LAVALLEY,

        Respondent.
------------------------------------------------- x

MEMORANDUM & ORDER

14-cv-01399 (ENV)

VITALIANO, D.J.

    Calvin Battles has filed a *habeas corpus* petition, *pro se*, pursuant to 28 U.S.C. § 2254. He was convicted by a jury, in 2005, on multiple counts stemming from killing one victim and severely injuring three others in an arson fire. Battles contends (i) that the trial court improperly imposed consecutive sentences, (ii) that he was unconstitutionally adjudged a persistent felony offender, (iii) that he was denied due process because the jury was not instructed on a lesser included offense of assault and (iv) that he was denied the effective assistance of counsel in plea bargaining. For the reasons set forth below, the writ is denied and the petition is dismissed.

## Background

### A. *Trial*

    Battles was tried in Kings County Supreme Court in November 2005 before Justice Abraham Gerges and a jury. Jury Trial, Vol. 2, *People v. Battles*, Indict. No. 4708/04 (ECF No. 18-1, 18-2). In their opening statement, the People frankly and succinctly described what the evidence at trial would show. By way of summary, the facts documented here are drawn from the prosecutor's opening statement. They are gruesome and chilling.

    On July 9, 2004, Battles went to apartment 7F at 185 Nevins Street in Brooklyn. At the time, it was known as a drug den. *Id.* at 8-9. An argument would break out between Battles and

1

Arthur Elliott. *Id.* In the course of the argument, Battles was overheard saying, "You know how easy this place can burn. I can burn this place down like nothing." *Id.* at 10. Later that night, Battles returned to the apartment, where Elliott was still present, along with Ronald Davis, Gregory Davis, Stephen Wheeler, Ernest Carter and Kiera Isbell, Battles's girlfriend. *Id.* at 10-11. Petitioner and Ronald Davis had a physical fight at some point after Battles had screamed angrily about Isbell's presence in the apartment. *Id.* at 11. Later, Battles declared, "I'll show you who the gangster is. I'll burn this place down. I'll burn all of y'all with it." *Id.* at 12. He went to the door of the apartment where a man named Herbert Miller was waiting. *Id.* Battles instructed Miller, "Get me the gas. Get me the gas out of the truck." *Id.* Battles then closed and blocked the door as Ronald and Gregory Davis attempted to escape. *Id.* Battles soon reentered the apartment with a red can of gasoline and began to pour it on the other occupants. *Id.* at 12-13. Battles then pulled out several lighters and ignited the gasoline. *Id.* at 13. As a result of the fire, Ronald Davis was killed, and Gregory Davis, Stephen Wheeler and Arthur Elliott all sustained severe burns. *Id.* at 14-15.

Defense counsel opened with a primary focus on the absence of facts and evidence, even in the teeth of the People's argument that the facts they forecasted would prove that Battles's conduct constituted intentional murder. *E.g., id.* at 23. Counsel offered Battles's version of events, in which he was attacked by those the People had labeled victims. *Id.* at 25. He also argued that the gas can was already present in the apartment before Battles arrived. *Id.* at 28. Finally, he stressed that, because the apartment was a crack den, all of the occupants had lighters that could have started the fire. *Id.* at 26, 28.

The People called Detective Karen Newman of the New York City Police Department's ("NYPD") Crime Scene Unit as their first witness. *Id.* at 51. She described her investigation of the crime scene, *id.* at 54-57, and then discussed several photographs depicting the apartment and the damage done by the fire, *id.* at 57-63. Additionally, she described several items from the scene that

2

were turned over to other investigatory personnel. *Id.* at 66-68. On cross-examination, defense counsel focused on the fact that other personnel had been in the apartment prior to Newman's arrival. *Id.* at 68-70.

Next to the stand was Police Officer Michael Kreismer. *Id.* at 70. He recounted his dispatch to the crime scene on the day of the crime. *Id.* at 71-73. Officer Kreismer testified as to the smoke and the emergency personnel who had responded to the fire. *Id.* at 73-74. He described the substantial fire damage to the building and the people he recalled seeing. *Id.* at 75-77.

Then, to put a face on the murder victim, Gwendolyn Davis took the stand. *Id.* at 82. She recalled that she had received a phone call telling her that her brother, Ronald Davis, had been killed, and she went to the hospital immediately. *Id.* at 83-84. She described her brother's injuries and stated that she had identified him at the medical examiner's office. *Id.* at 84-85.

The People's next witness was Assistant District Attorney Douglas Appel. *Id.* at 87. As part of his office's "riding program," some sort of on-scene outreach, ADA Appel interviewed several witnesses at the crime scene. *Id.* at 88-90. He recounted his interview of a "Mr. Michael Bratton" on July 20, 2004. *Id.* at 90. Despite his protestations that "Mr. Bratton" wait for the video camera to turn on, "Mr. Bratton" began talking and admitted to ADA Appel that he had poured the gasoline at the crime scene. *Id.* at 91. After reading "Mr. Bratton" his *Miranda* rights, *id.* at 92-93, ADA Appel conducted two video interviews, which were admitted into evidence, *id.* at 94-95. "Mr. Bratton," it was later learned, was actually Battles, and ADA Appel then correctly identified him in the courtroom. *Id.* at 94.

Filling in more of the details, Firefighter Brian Connelly testified that he had been dispatched to the scene of the fire. *Id.* at 106. Firefighter Connelly described the smoke he encountered there. *Id.* at 107-08. He also testified as to the condition of the victims. *Id.* at 112-13. Lastly, he placed the gas can at the scene of the fire, where he had found it. *Id.* at 115-16.

3

Next, the People called paramedic Erick Marketan, *id.* at 119, who had responded to the 911 call, *id.* at 125. He described the severe burns and life-threatening injuries suffered by victim Stephen Wheeler, *id.* at 126-27, as well as the treatment he provided, *id.* at 128-33. He also testified to his identification of gasoline as the incendiary agent that caused the burns he had treated. *Id.* at 134-35.

With the stage set, a powerful narrative followed from Gregory Davis, a victim of the fire and brother of the deceased. *Id.* at 146. Drawing the teeth of cross, he recounted his criminal history and the full nature of his relationship with the other victims. *Id.* at 145-57. With that base, direct examination moved to the day of the fire. *Id.* at 159-80. Davis told the jury that the torched apartment was a drug den and told them what drugs were used there. *Id.* at 159-65. Describing the arrival of Battles, he said he heard someone say, "Do you remember where I put this can of gasoline?" to which another person responded affirmatively. *Id.* at 166. The first person then said, "Well, go get it." *Id.* Dramatically, Davis then identified Battles as that "first person." *Id.* at 167. He recounted for the jury his failed attempt to leave the apartment, the door being either locked or held closed. *Id.* at 169. Davis testified that he was doused with gasoline, *id.* at 169, from a red can held by petitioner, *id.* at 171-72. As Battles poured gasoline on Davis's brother, Davis saw him with a lighter in his hand. *Id.* at 172. After the gasoline was poured on him and his brother, Davis said, he saw flames moving about the apartment and also saw that his brother was on fire. *Id.* at 178. At this point, his own head and arms ignited. *Id.* at 179. The next thing he remembered, he said, was awaking in the hospital. *Id.* at 180. He remembered the pain; he remembered the treatment that followed. *Id.* at 180-183. That point was emphasized when Davis described his injuries and showed his burns to the jury. *Id.* at 192-93. Cross-examination brought the expected impeachment by reference to Davis's criminal record and history of drug use, *id.* at 194-214, including whether his perceptions of the crime were impaired by drugs, *id.* at 215-25.

4

NYPD Detective Peter McMahon, assigned to Brooklyn South Homicide, was the next witness. *Id.* at 243-44. He described his investigation of the crime scene, *id.* at 245-47, and the search that led to Battles, *id.* at 247-49. Detective McMahon explained that he was unable to interview either Gregory Davis or Stephen Wheeler because each was in a coma, but he was able to interview Arthur Elliott. *Id.* at 250. Detective McMahon described the arrest of petitioner, and he identified Battles in court. *Id.* at 250-52. He told the jury about his interview of Battles. *Id.* at 253. It began with his *Miranda* warnings, he said. *Id.* at 253-55. In his statement, Battles, he recalled, described an argument over drugs, *id.* at 257, claiming that although he sprayed gasoline on others in the apartment, he did so to defend himself, *id.* at 258. Battles also claimed that Arthur Elliott's cigarette had ignited the gasoline. *Id.* at 259. Cross-examination noted a week's time between crime and arrest to spotlight that Battles did not attempt to flee. *Id.* at 265. The cross also reminded the jury that Battles had freely spoken to police to give his account of the fire. *Id.* at 265-66. More importantly, it drew out that Battles pulled the lighter, which was broken, and intended to use it only if he were threatened violently by the others in the drug den. *Id.* at 267.

Fire marshal Richard Grigoli was then qualified as an expert to offer his opinion as to the cause, origin and effects of the fire, using photographs in the course of his analysis. *Id.* at 276-79. Grigoli testified that victim Ronald Davis was burned by ignitable liquid, *id.* at 281, and that, although some of the liquid splashed onto him, his larger burns were caused by pouring the liquid on him, *id.* at 282. He testified that the fire was non-accidental or manmade. *Id.* at 323, 341. The fire marshal also described the injuries that he later observed at the medical examiner's office. *Id.* at 324. Based on the burns he examined, he confirmed his conclusion that the gasoline had been poured, rather than inadvertently splashed, on the victims. *Id.* at 325-30, 339-40. As might be expected, cross-examination sought to peck against the reconstruction Fire Marshal Grigoli presented, offering an alternative account that he did not consider. *Id.* at 345-46.

5

The People then called medical examiner Dr. Michele Sloane, who had performed the autopsy on Ronald Davis. *Id.* at 365. She testified that thermal burns covered 43% of his body surface area. *Id.* The medical examiner described other injuries but concluded that death was caused by smoke inhalation and burns. *Id.* at 365-67. Dr. Sloane also found that Davis had consumed alcohol and cocaine prior to his death, *id.* at 370, which drew the focus of cross-examination, *id.* 76-79.

Another victim, Arthur Elliott, would take the stand. *Id.* at 375. For the same reasons, he too admitted to his criminal history and drug use. *Id.* at 375-80. He told the jury about the relationships among the drug den participants and that he was aware one of them, Battles, went by the name "Shamel." *Id.* at 380-88. Elliott described his argument with Battles for the jury, including how petitioner pulled out a gun and threatened to burn down the apartment. *Id.* at 391-95. It was Omar Stewart, a cousin of Battles, he said, who came to the apartment with a can of gasoline. *Id.* at 102-103. Battles later arrived, Elliott testified, angry and demanding the gasoline. *Id.* at 405-09. When the gas was brought out, he said, he saw Battles splash it around the living room. *Id.* at 410-11. Elliott heard Ronald Davis say, "Come on, man, stop pouring that on me. Come on, Shamel, what did I do? You [*sic*] getting gas all over me." *Id.* at 412. After that, he testified, Battles began throwing gasoline down the hall and onto him. *Id.* at 414. Elliott noted that he had flicked his cigarette into the bedroom and was not holding it when Battles pushed him to the floor. *Id.* at 417. He then saw Battles reach for a cigarette lighter. *Id.* Confirming the broken lighter story, he said that Battles reached for a second lighter and used it to set him on fire. *Id.* at 419. Eventually, the living room went up in flames. *Id.* at 423. Elliott described his treatment at Long Island College Hospital and Cornell Burn Center. *Id.* at 427. That account told of his surgeries and skin grafts. *Id.* at 427-30. Defense impeachment followed the same plan directed against Davis. *Id.* at 436-53. The cross also sought to highlight discrepancies between Elliott's account of what

6

had happened at the apartment and the accounts given by other witnesses. *Id.* at 459-60, 463-65, 468-73.

Next came Omar Stewart, who identified himself as a friend of Battles, *id.* at 490, and who admitted that he had brought the red can of gasoline from 574 Warren Street, *id.* at 499-500. He testified that he went to the apartment and became aware of a gasoline smell after Battles woke him. *Id.* at 508. He said he tried, unsuccessfully, to defuse the argument. *Id.* at 511-12. His testimony then confirmed that Battles had pushed Elliott to the floor, which was when the fire ignited. *Id.* at 512. He explained that as the fire burned, he saw Battles with the gas can, even following Elliott's escape from the apartment. *Id.* at 517. Stewart acknowledged that he had gone off to Pennsylvania after the fire. *Id.* at 522-23. More importantly, he testified to a post-crime conversation with Battles, who feared that Stewart might turn him in. *Id.* Cross-examination focused on Stewart's use of drugs to cast doubt on his credibility. *Id.* at 528-30.

Returning to the horror of the fires, the People called Dr. Joseph Turowski, a burn surgeon from the Cornell Burn Unit. *Id.* at 531-32. Dr. Turowski testified about the treatment of Stephen Wheeler and Gregory Davis. *Id.* at 534-41. His testimony was prefatory to that of the final prosecution witness, Stephen Wheeler. *Id.* at 545-47. Wheeler set the scene by describing his arrival at Arthur Elliott's apartment. *Id.* at 554-59. He told the jury about the argument that ensued. *E.g., id.* at 560. Wheeler testified that he saw Battles pour gasoline on Ronald Davis's face, *id.* at 577, and heard him threaten to burn the apartment down shortly before retrieving the gasoline he used on Ronald Davis, *id.* at 578, 588. Wheeler recalled for the jury details of his escape from the apartment and of his medical treatment for the burn injuries he had suffered in the fire. *Id.* at 591-94. There was little for cross other than impeachment with Wheeler's use of drugs. *Id.* at 599-601. The theme of nothing new would continue as Battles invoked his right to remain silent and the defense called no witnesses. *Id.* at 605-06.

7

Daunting the task, the defense summation concentrated on Battles's state of mind, *id.* at 637; petitioner's statement to police that he did not start the fire, *id.* at 639-40; the drug use of all at the apartment, *e.g., id.* at 641; and discrepancies in the accounts of how the fire ignited, *id.* at 650-51, and as to whether Battles physically fought with Ronald Davis, *id.* at 651. The argument seemed to suggest that the victims were antagonists since they did not leave the apartment when they say they heard Battles say that he was going to retrieve gasoline. *Id.* at 653. On this point, counsel drew the jury's attention to the contrast between the fire marshal's testimony that the victims were standing up when the gasoline was doused and the testimony of others that the victims were sitting or lying down. *Id.* at 658. To make the story fit, counsel challenged Elliott's testimony that Battles had lit the fire by noting that the claim was not corroborated by any other witnesses. *Id.* at 662-63.

As might be expected, the People's summation let the evidence speak for itself, calling the jury's attention to the general brutality of it all. The People reminded the jury that Battles had called for the gasoline and admitted to having the gas can in his hand. *Id.* at 692. The summation recalled Battles's threats, rebutting his claim that he used the gas can to defend himself. *Id.* at 694-97, 705-06. It underscored the evidence that Battles had poured gasoline on his victims and ignited the fire himself, including the detailed testimony of the fire marshal. *Id.* at 699-701. Finally, the People drew the jury back to the victims' injuries. *Id.* at 709-12. In the face of the victims' consistent accounts, the expert testimony, the photographs, the diagrams, and Battles's unsupported alternative account, there was no reasonable doubt.

On November 15, 2005, the jury convicted Battles of one count of murder in the second degree, one count of manslaughter in the second degree and three counts of assault in the first degree but acquitted him of murder in the first degree and felony murder. *Id.* at 784-86. He was later adjudged a persistent felony offender. Sentence, *People v. Battles*, Indict. No. 4708/04, at 14 (ECF No. 18-2) ("Sentence"). Battles was sentenced to concurrent terms of 25 years to life on the

murder and manslaughter counts, to consecutive terms of 25 years to life on two of the assault counts, and to 20 years to life on the remaining assault count, with the prison terms on the assault counts to run consecutively to the prison terms on the murder and manslaughter counts. *Id.* at 22-24.

B. *Post-Trial Proceedings*

Battles appealed his convictions to the Appellate Division, Second Department. He argued there that the evidence was legally insufficient to support the depraved indifference murder and assault charges, that the trial court violated the Due Process Clause by failing to submit any lesser included offenses of depraved indifference assault to the jury, that the imposition of consecutive sentences violated New York Penal Law § 70.25(2), that the trial court erred in considering that he had deliberately ignited the fire, that the sentence was excessive and that he was unconstitutionally adjudged a persistent felony offender. Br. for Def.-Appellant, *People v. Battles*, Indict. No. 4708/04, at ii-iii (2d Dep't 2006) (ECF No. 18-3). In a supplemental brief, Battles also argued that the manslaughter count should be dismissed because it was a lesser included offense of murder, that the prosecutor knowingly presented false testimony and that Battles was denied effective assistance of counsel when trial counsel failed to raise certain objections to evidence. Suppl. Br., *People v. Battles*, Indict. No. 4708/04, at i (2d Dep't 2006) (ECF No. 18-3).

On September 15, 2009, the Appellate Division modified the judgment by vacating the conviction for manslaughter in the second degree. *People v. Battles*, 65 A.D.3d 1161 (2d Dep't 2009). It otherwise affirmed the judgment. *Id.* It had no effect on the overall sentence. Petitioner was granted rare leave to appeal to the New York Court of Appeals. *People v. Battles*, 13 N.Y.3d 905, 922 N.E.2d 908, 895 N.Y.S.2d 319 (2009). Battles argued to the high court that the imposition of consecutive sentences was unlawful and that the adjudication that he was a persistent felony

9

offender was unconstitutional. *People v. Battles*, 16 N.Y.3d 54, 57-58, 942 N.E.2d 1026, 917 N.Y.S.2d 601 (2010).

The results were mixed. The Court of Appeals held that it was permissible to impose consecutive sentences with respect to the crimes against Ronald Davis, Gregory Davis, and Arthur Elliott because separate acts constituted the *actus reus* of these offenses, but that the sentence pertaining to Stephen Wheeler had to run concurrently with the other sentences. *Id.* at 58-59. Further, the high court held that the challenge to his persistent felony offender adjudication lacked merit. *Id.* at 59. On October 2, 2011, Battle's petition for a writ of *certiorari* was denied. *Battles v. New York*, 132 S. Ct. 123 (2011).

With direct appeal at an end, on September 20, 2012, Battles moved for collateral relief, pursuant to New York Criminal Procedure Law § 440.10, seeking to vacate his conviction, alleging that he received ineffective assistance of counsel in plea bargaining. He alleged that, prior to trial, the People had offered a plea of 20 years to life and that counsel failed to advise him that a sentence after trial could run consecutively, which, he says, had he known, he would have taken the deal. Affirmation in Supp. of Mot. Pursuant to CPL § 440.10, *People v. Battles*, Indict. No. 4708/04, at 3 (ECF No. 12-1). On January 11, 2013, Supreme Court held a hearing on this motion. Tr. of Post-Trial Hr'g, *People v. Battles*, Indict. No. 4708/04 (Sup. Ct., Kings Cty., 2013) (ECF No. 18-5) ("Post-Trial Tr."). By decision and order dated June 12, 2012, the motion was denied. Decision and Order, *People v. Battles*, Indict. No. 4708/08, at 13 (Sup. Ct., Kings Cty., 2013) (ECF No. 12-1). His subsequent application for a writ of error *coram nobis* was also denied. *People v. Battles*, 127 A.D.3d 984 (2d Dep't 2015).

Battles then brought a *habeas* proceeding here, which was dismissed without prejudice because petitioner had not exhausted state court remedies. Mem. & Order (ECF No. 6). Petitioner's motion for reconsideration was denied. Mem. & Order (ECF No. 15). His appeal was

dismissed by the Second Circuit. Mandate of USCA (ECF No. 16). After the further state proceedings were concluded, Battles renewed his quest for federal habeas relief.

## Legal Standard

Post-conviction federal *habeas* relief is dominated by the Anti-Terrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), which provides that a writ of *habeas corpus* shall not issue with respect to any claim of a prisoner in state custody that was adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d); *see also Gutierrez v. McGinnis*, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"). Such deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether that court gives reasons for its determination or refers to federal law in its decision. *Harrington v. Richter*, 562 U.S. 86, 98-99, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011); *see also Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001). "Section 2254(d) reflects the view [of Congress] that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102-03 (citation and internal quotations omitted). *Habeas* review under AEDPA "demands that state-court decisions be given the benefit of the doubt." *Hardy v. Cross*, 565 U.S. 65, 66, 132 S. Ct. 490, 181 L. Ed. 2d 468 (2011) (citation omitted). Where AEDPA deference applies, "[a] state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" *Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)).

*Habeas corpus* jurisprudence, given these ground rules, is well-cabined. For the purposes of federal *habeas* review, "clearly established federal law" refers to the holdings, as opposed to *dicta*, of Supreme Court decisions that are controlling law at the time of the relevant state-court decision. *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). A state-court decision is "contrary to clearly established federal law," within the meaning of § 2254(d), if it contradicts relevant Supreme Court precedent or arrives at a different conclusion based on "materially indistinguishable" facts. *Id.* at 405-06. A state-court decision is classified as one resting on an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Even erroneous state-court decisions, then, if deemed reasonable, will survive *habeas* review. *Id.* at 411.

At the same time, the state-court decision need not be "so far off the mark as to suggest judicial incompetence" before *habeas* relief may be granted. *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (citation omitted). It remains true that "a federal court may reverse a state-court ruling where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'" *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103). Yet, it must also be kept in mind that "[i]f this standard is difficult to meet – and it is – that is because it was meant to be." *Burt v. Titlow*, 571 U.S. 12, 20, 134 S. Ct. 10, 187 L. Ed. 2d 348 (2013) (citation and internal quotations omitted).

AEDPA superimposes another potential obstacle to federal *habeas* relief, that is, where a *habeas* claim was denied by the state court on independent state-law procedural grounds. A federal petitioner can only overcome such a procedural bar by either "show[ing] cause for failing to [comply with the state procedural requirement] and prejudice therefrom" or "show[ing] that a

fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey v. Zant*, 499 U.S. 467, 494-95, 111 S. Ct. 1454, 113 L.Ed.2d 517 (1991).

To satisfy the first requirement, *i.e.*, to establish cause excusing the default, a petitioner must "show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim in state court." *Id.* at 493 (citing *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986)). Such "[o]bjective factors" can include "interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel." *McCleskey*, 499 U S. at 493-94 (citation and internal quotation marks omitted). Once cause has been demonstrated, the petitioner must show "actual prejudice resulting from the errors of which he complains." *Id.* at 494 (citation and internal quotation marks omitted).

Alternatively, a petitioner can seek to meet the much higher burden of showing that upholding the state-court procedural bar would result in a "fundamental miscarriage of justice," but such a showing is limited to "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *Id.*

Discussion

A.  *Consecutive Sentences*

Petitioner argues that the imposition of consecutive sentences was illegal because petitioner's offenses derived from a single *actus reus*. What AEDPA requires, however, is a showing that the imposition of consecutive sentences was contrary to clearly established federal law or involved an unreasonable application of such law. Whether sentences run concurrently or consecutively is "purely a matter of state law." *Figueroa v. Grenier*, No. 02 Civ. 5444 (DAB) (GWG), 2005 U.S. Dist. LEXIS 1465, at *42 (S.D.N.Y. Feb. 3, 2005); *accord Joseph v. Racette*, No. 12-cv-1693 (NGG), 2014 U.S. Dist. LEXIS 51471, at *20-21 (E.D.N.Y. Apr. 14, 2014). This is

13

so because there is "no constitutionally cognizable right to concurrent, rather than consecutive, sentences." *United States v. White*, 240 F.3d 127, 135 (2d Cir. 2001). In other words, his argument fails because petitioner cannot "identify a clearly established Supreme Court precedent that bears on [it]," *Loliscio v. Goord*, 263 F.3d 178, 191 (2d Cir. 2001). It is not within the mission of a federal *habeas* court to second guess the resolution of state-law issues by state courts. *See Mannix v. Phillips*, 619 F.3d 187, 199 (2d Cir. 2010) (quoting *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)).[1] There being no federal issue presented, issuance of the writ on this ground is denied.

B.  *Persistent Felony Offender Status*

This time with a claim rooted in the Constitution, petitioner contends that the state court violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), when it adjudged him a persistent felony offender ("PFO") because the sentencing procedure involved a factual determination by a judge, rather than a jury. At issue is New York's discretionary PFO statute, N.Y. Criminal Procedure Law § 400.20. *See* Sentence at 2. However, the Second Circuit has previously analyzed this statute and determined that it is not unconstitutional, given the New York Court of Appeals' interpretation of the statute and the deference owed to state courts under AEDPA. *Portalatin v. Graham*, 624 F.3d 69, 89 (2d Cir. 2010); *see also Brown v. Miller*, 451 F.3d 54 (2d Cir. 2006); *Brown v. Greiner*, 409 F.3d 523 (2d Cir. 2005).

The Second Circuit held, in *Portalatin*, that the statute did not violate *Apprendi*, applying its own interpretation of federal law and the New York Court of Appeals' interpretation of the PFO statute. As interpreted by the New York Court of Appeals, "the only 'fact' necessary to impose a PFO sentence . . . is the 'fact' of recidivism." *Portalatin*, 624 F.3d at 84 (citing *People v. Rosen*, 96

---

[1] Battles had a full opportunity to litigate this issue in state court, and his argument was squarely rejected. *See Battles*, 16 N.Y.3d at 58-59.

14

N.Y.2d 329, 335, 728 N.Y.S.2d 407, 752 N.E.2d 844 (2002)). "The statute authorizes indeterminate sentencing once the court finds persistent felony offender status," and "the predicate felonies are both necessary and sufficient conditions" for finding this status. *People v. Rivera*, 5 N.Y.3d 61, 66-68, 800 N.Y.S.2d 51, 833 N.E.2d 194 (2005). Because PFO status is triggered solely by recidivism, the Second Circuit held that the statute's definition of PFO status did not violate *Apprendi*. Indeed, as long as a judge imposes PFO status based solely on prior convictions, it is not unconstitutional to then rely on other judicial factfinding in imposing a sentence within the statutory range for PFOs. *Portalatin*, 624 F.3d at 88.

Fatal to Battles's argument is the absence of any showing that the PFO statute was misapplied. The state-court record is crystal clear that the trial judge properly applied the New York statute, and *Portalatin* thus renders the sentencing procedure constitutional. Specifically, the trial judge first received evidence sufficient to find Battles to be a PFO in the form of five certificates of conviction, signed and sealed by the clerks of Kings and Queens County. Sentence at 2-5. Because the procedure used in sentencing Battles complied with New York's PFO statute, it complied with *Portalatin* and, by extension, with *Apprendi*. Therefore, petitioner is not entitled to *habeas* relief on this ground either.

C.  *Failure to Charge the Jury on a Lesser Included Offense*

Straying back into the field of state criminal procedure law, Battles argues that he was deprived of his due process right to a fair trial because the trial court did not submit for jury consideration assault in the third degree, or reckless assault, as a lesser included offense of assault in the first degree, or depraved indifference assault.

The claim is defeated at the doorstep, however, because the claim has been procedurally defaulted as a matter of federal *habeas* jurisprudence. In *Wainwright v. Sykes*, the Supreme Court held that "absent a showing of 'cause' and 'prejudice,'" a "state procedural waiver" constitutes "an

independent and adequate state procedural ground" that "bar[s] federal habeas review." 433 U.S. 72, 87, 97 S. Ct. 2497, 53 L. Ed. 2d 594 (1977) (quoting *Francis v. Henderson*, 425 U.S. 536, 538-39, 96 S. Ct. 1708, 48 L. Ed. 2d 149 (1976)). That is the case here. The Appellate Division found that petitioner's claim was "unpreserved for appellate review," *Battles*, 65 A.D.3d at 1162, because petitioner failed to comply with New York's contemporaneous objection rule, N.Y. Criminal Procedure Law § 470.05(2). The Second Circuit has held that failure to comply with this rule constitutes an independent and, when properly applied, adequate state-law ground for decision that bars federal *habeas* review. *Garcia v. Lewis*, 188 F.3d 71, 76-82 (2d Cir. 1999); *see Bossett v. Walker*, 41 F.3d 825, 829 n.2 (2d Cir. 1994) (recognizing the rule as an adequate bar to federal *habeas* review); *Fernandez v. Leonardo*, 931 F.2d 214, 216 (2d Cir. 1991) (discussing the New York rule). Therefore, absent a showing of cause, petitioner's failure to comply with the contemporaneous objection rule bars consideration of his claim.

The burden is on the petitioner to make that showing. Procedural defaults may be excused when a *habeas* petitioner shows cause for the default and that prejudice will result. *Wainwright*, 433 U.S. at 87. Here, Battles has not even attempted to show cause. Moreover, he was not prejudiced because his argument is meritless. Federal law applicable in *habeas* review of state-court convictions does not require a trial court to submit jury instructions on lesser included offenses in non-capital cases. The Supreme Court has held that "if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction," a state court "is constitutionally prohibited from withdrawing that option from the jury *in a capital case*." *Beck v. Alabama*, 447 U.S. 625, 637, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980) (emphasis added). However, in *Beck*, the Court explicitly noted that it "need[ed] not and d[id] not decide whether the Due Process Clause would require the giving of such instructions *in a noncapital case*." *Id.* at 637 n.14 (emphasis added); *see also Harmelin v. Michigan*, 501 U.S. 957, 994, 111 S. Ct. 2680, 115 L.

16

Ed. 2d 836 (1991) (listing *Beck*'s holding as an example of a rule where "death is different"); *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996) (citing *Beck*, 447 U.S. at 638 n.14); *Powell v. Phillips*, No. 05 Civ. 3537 (DLC), 2009 WL 929538, at *14 (S.D.N.Y. Apr. 7, 2009) (noting that the Supreme Court "expressly reserved the question of whether the Due Process Clause requires that the jury be given a lesser-included-offense instruction in non-capital cases" (citing *Beck*, 447 U.S. at 638 n.14)).

Following these precedents, courts in this circuit have repeatedly declined to grant *habeas* relief for failure to charge a lesser included offense in a non-capital case. *See, e.g., Lindsey v. Fischer*, No. 02 Civ. 1668 (LBS), 2004 WL 112884, at *7 (S.D.N.Y. Jan. 23, 2004); *Wai v. Fischer*, No. 02 Civ. 3778 (HB), 2003 WL 22416117, at *3 (S.D.N.Y. Oct. 22, 2003); *Collins v. Greiner*, No. 02-cv-4727 (JBW), 2003 WL 22953067, at *12 (E.D.N.Y. Oct. 15, 2003). With the death penalty off the table, that the jury was not instructed on a lesser included offense did not offend the Due Process Clause, given Supreme Court precedents at the time of trial. As with the prior claims, this ground does not entitle Battles to *habeas* relief.

D. *Ineffective Assistance of Counsel*

The last refuge of many *habeas* proceedings, Battles claims ineffective assistance of counsel in plea bargaining. Pet. at 3 (ECF No. 1). He argues nakedly that counsel was deficient in failing to inform him that his sentences after conviction at trial could run consecutively, and that he would have accepted a plea bargain had he understood this. However, petitioner does not meet the standard for relief on an ineffective assistance claim.

The Supreme Court has established a framework for evaluating claims of ineffective assistance of counsel in the context of plea bargaining. The analysis begins with the notable caveat that "[i]f no plea offer is made, or a plea deal is accepted by the defendant but rejected by the judge, the issue raised here simply does not arise." *Lafler v. Cooper*, 566 U.S. 156, 168, 132 S. Ct. 1376,

17

182 L. Ed. 2d 398 (2012). That is so because "defendants have 'no right to be offered a plea.'" *Id.* (quoting *Missouri v. Frye*, 566 U.S. 134, 148, 132 S. Ct. 1399, 182 L. Ed. 2d 379 (2012)). Otherwise, the framework elaborates on *Strickland v. Washington*'s standard for ineffective assistance claims.

Under *Strickland*, a defendant challenging his conviction must satisfy a two-pronged test, focusing on performance and prejudice. The performance prong requires a defendant to show "that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This standard is the same regardless of whether plea bargaining or a trial is at issue. However, a particular prejudice standard applies to plea bargaining. First, a defendant "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea, and the prosecution would not have withdrawn it in light of intervening circumstances)." *Lafler*, 566 U.S. at 164. A defendant must further show a reasonable probability "that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* If this standard is met, a court may offer relief.

Despite his swearing to the contrary, Battles is not entitled to relief because no plea offer was extended. In a thoroughly appropriate manner, when Battles made his charge about counsel's ineffective plea bargaining assistance, the trial judge announced a fact hearing to get to the bottom of it. Battles testified without any independent evidence of it that his trial counsel "informed [him] that the People had offered twenty to life." Post-Trial Tr. at 8. To rebut this claim, the People called prosecutor Timothy Gough, who described the ordinary procedures for plea bargaining in his office and indicated that none of those procedures had been followed here because no plea had been

18

offered. *Id.* at 36-41. Gough invoked both his own recollection of the prosecution and his review of the files prior to the post-trial hearing, which revealed no evidence that his office had offered a plea deal to Battles. *Id.* The state court then found that it was "clear that the People did not offer defendant a sentence of 20 years to life in exchange for a plea of guilty." Decision and Order, *People v. Battles*, Indict. No. 4708/08, at 10 (Sup. Ct., Kings Cty., 2013) (ECF No. 12-1).

Such factfinding by the state court will ordinarily preclude further factfinding by a federal *habeas* court. This Court may disturb the state court's finding only if it "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). It must "presume[]" that "a determination of a factual issue made by a State court" is "correct," and petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Given the testimony and documentary evidence provided by the prosecutor, contradicted only by petitioner's say so, the presumption of correctness holds.

Plainly, on this record, it cannot be that the state court's finding was unreasonable. *Cf. Donahue v. Griffin*, 2016 WL 5404584, at *26 (W.D.N.Y. Sept. 28, 2016) (holding that a habeas petitioner's assertion is insufficient to overcome § 2254(e)(1)'s presumption). In short, the state-court finding that that the People did not offer a plea deal is dispositive. Since an ineffective assistance of counsel claim pegged to plea bargaining cannot stand in the absence of a plea offer from the People, *see Lafler*, 566 U.S. at 168, the writ cannot issue. Scrambling, Battles tries to fit questions by the trial judge into the category of a plea offer by the trial court. Pet'r's Mem. of Law at 1-4 (ECF No. 25). The record, however, is clear that no plea deal was offered by the trial judge either. Post-Trial Tr. at 41; Decision and Order, *Battles*, at 11-12. After hearing evidence at the post-trial hearing, the trial court found that no plea deal, without any question, was ever offered to Battles. Decision and Order, *Battles*, at 10. Simply put, there are no facts in the record that would

19

permit a federal *habeas* court to reexamine that finding. As with petitioner's other claims, the writ cannot issue on this basis.

## Conclusion

For the foregoing reasons, a writ of *habeas corpus* is denied, and the petition is dismissed.

Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. *See* 28 U.S.C. § 2253(c)(2).

The Court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Memorandum and Order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

The Clerk of Court is directed to mail a copy of this Memorandum and Order to petitioner, to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York
September 2, 2018

/s/ USDJ ERIC N. VITALIANO
ERIC N. VITALIANO
United States District Judge

20